IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

                                                                                                                 REPORT AND
                       Plaintiff,                          RECOMMENDATION

     v.

                                                                                     10-cr-189-wmc

ERIC C. MAHOLMES,

                     Defendant.
_____

REPORT

The grand jury has charged defendant Eric Maholmes with possessing crack cocaine with intent to distribute it. The drugs were found in a safe opened by Wausau police officers executing a search warrant in a missing persons investigation. Maholmes has moved to suppress the drugs (and his subsequently derived statements), asserting that the search unlawfully exceeded the scope of the warrant. *See* dkt. 11. For the reasons stated below, I am recommending that this court deny Maholmes's motion to suppress.

I have found the facts below from the documents submitted by the parties and from the testimony of Wausau Police Detective Matthew Barnes, whose demeanor and credibility I judged at an April 15, 2011 evidentiary hearing, *see* dkt. 19.

FACTS

In the fall of 2010, defendant Eric Maholmes lived with his girlfriend Stephanie Low in a second-story apartment at 701½ West Thomas Street in Wausau. Maholmes was on state supervision for a 1999 robbery conviction and a 2004 cocaine trafficking conviction. In 2007, Maholmes had been arrested in Cook County, Illinois for possessing of crack cocaine, but the charge was dismissed. On October 8, 2010, Maholmes was arrested and jailed for a probation

violation arising out of drinking alcohol.  There are tapes from the jail telephone of Maholmes after his arrest conversing with Low, and other people saw Low in good health after Low's arrest.

On October 10, 2010, Low's mother, Claudia Blake, called the Wausau police to report Low missing under suspicious circumstances.  That evening, Officers Kindlarski and Lee went to Low's apartment, which the officers had visited on "prior complaints," some of which revealed that Low had "mental health issues."  There, they interviewed Clark Prosser, Shelley Resch and Ellysa Clendening, three of Low's friends who had raised concerns about Low's welfare.

According to the three friends, Low had telephoned Resch the night before (October 9, 2010) claiming that she was frightened that a man named Artez Williams (Maholmes's cousin and known to the police) had sent her threatening text messages, telling her that she was not good enough for Maholmes.  Low believed Williams had a gun and that he might be coming over.  Resch was dating Low's brother, Dan Blake; Low asked Resch if Blake could drive over and spend the night.  Blake did not make the trip because he and Resch had no gas money.  Resch tried to call Low back to discuss this but Low did not answer her phone.

The friends told the police that the next morning, October 10, 2010, Prosser went to check on Low and found the entry door to her building locked.  When all three friends decided to go back and check again that afternoon, the entry door was unlocked and ajar, and a dog crate was on the sidewalk.  The friends went upstairs to the apartment, which was locked; they defeated the lock and let themselves in.  They found one of Low's dogs acting "frightened."  In the bathroom, Resch found the toilet seat up, which was unlike Low.  In Low's bedroom, they saw on the mattress spots that looked like blood and a wet spot that smelled like bleach.  A horse-print blanket was missing.  On the bedroom floor were droplets that looked like blood.

One of Low's favorite slippers was still in the apartment, the second was missing. Low's purse was in the closet but her keys and her cell phone were gone. The friends had repeatedly called Low's cell phone but she had not answered, which was "very unusual." They checked some of Low's usual haunts and called local hospitals, but were unable to locate Low.

The officers conducted their own welfare check of the apartment. They noticed that the bathroom floor was sticky near the door. In the bathroom was a wet towel and a bucket containing cleaning solution and a mop. In Low's bedroom, officers saw a bare mattress, stains on the mattress consistent with blood stains and a large, red-fringed wet spot that appeared to have been wiped up with a bleach cleaning solution. There was a white shirt on the floor with red spots on it. There were red spots on the bedroom walls, on the carpet leading toward the door, and on the bedroom door. The door also had streaks that looked like some liquid had flowed down the door. All of the red spots were consistent with blood. There were red spots on the walls of the hallway. *See* October 11, 2010 search warrant affidavit, dkt. 14. One implication of this evidence–but not the only implication–was that Low's disappearance was intertwined with bloody violence and a hasty, incomplete cleanup attempt.[1]

While police were still at Low's residence, Artez Williams, his girlfriend and another woman showed up. They all talked to the police. Williams denied having seen or done anything to Low, or knowing where she was. One of Williams's friends (Amber Gilman) told the police that Low might have been stepping out on Maholmes with some guy named "Trent." The other woman (Amanda Gilman) labeled Low as "bipolar" and provided some hearsay information that

---

[1] In Detective Barnes's opinion, the amount of blood he saw in the apartment was less than police would find after a homicide by gunshot or stabbing, and could have been consistent with activities that did not involve injury to Low. *See* April 15, 2010 transcript, dkt. 19, at 19. Put another way, Detective Barnes had not ruled out the possibility that Low was safe and had left of her own volition.

implicated "Trent" in Low's disappearance. From Gilman's cell phone police got copies of the October 9, 2010 text dialogue between Low, Williams and Gilman. These texts are reported verbatim by Officer Lee at page 6 of his October 11, 2010 report, dkt. 16-1.

The investigation was taken over by police detectives. On the morning of October 11, 2010, after consulting with the district attorney's office, Detective Matthew Barnes applied for and obtained a state search warrant for to search Low's apartment for:

> Biological evidence, including blood stains and spatter; any items used to clean or conceal biological evidence; any dangerous weapons or items that may be used as dangerous weapons associated with the biological evidence; *and any evidence probative of the current whereabouts of Stephanie A. Low*.

*See* dkt. 13, emphasis added.

At the time he applied for the warrant, Detective Barnes was not aware of any information suggesting that drugs might have been sold from Low's apartment.

Police executed the warrant that same day. In demarcating the boundaries of what could be searched, the police viewed any container that likely could contain documents as within the scope of their warrant. They searched closed purses and bags. They did not search smaller or illogical containers, such as cereal boxes or mayonnaise jars, which police routinely search when executing warrant searching for drugs.

In a bedroom closet, officers found a locked safe, about the size of a typewriter case.[2] The police believed this safe was within the scope of the warrant because what it contained– or failed to contain–could have been relevant to determining what had or had not happened to Low. It might have contained a weapon, blood spatters (evidencing post-assault entry into the

---

[2] *See* photo of safe, Gov't Exh. 3, dkt. 16-3. Does anyone remember typewriter cases?

4

safe), a passport (or not), a receipt for a bus or airplane ticket. Not finding any key, the police pried the safe open with a hammer and a pry tool. In the safe they found no evidence relevant to Low's fate or current whereabouts, but they did find the crack cocaine that has been charged against Maholmes in this federal prosecution.

ANALYSIS

Maholmes contends that the it was constitutionally unreasonable for the police to open the safe because the search warrant for Low's apartment was too broad or the safe was outside the scope of the search warrant. Maholmes implies that the police knew they shouldn't open the safe but they did it anyway to see if they could find evidence of his drug dealing.

As the Supreme Court recently reiterated,

> Fourth Amendment reasonableness is predominantly an objective inquiry. We ask whether the circumstances, viewed objectively, justify the challenged action. If so, that action was reasonable, *whatever* the subjective intent motivating the relevant officials. This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts, and it promotes evenhanded, uniform enforcement of the law.

*Ashcroft v. al-Kidd*, ___ U.S. ___, 131 S.Ct. 2074, 2080 (2011), emphasis in original, internal quotes and citations omitted. As a starting point, Detective Barnes disclaimed any knowledge that Maholmes was a suspected drug dealer and I have no reason to doubt that disclaimer. But even if the Wausau police had an ulterior motive to pry open the safe, it would be irrelevant to the Fourth Amendment analysis. The question is whether the known facts and circumstances were sufficient to warrant reasonably prudent officers in the belief that the locked safe contained "any evidence probative of the current whereabouts of Stephanie A. Low." *See, e.g., Ornelas v. United States*, 517, 690, 696 (1996).

5

Put another way, given the nature of the evidence sought and the crime alleged, it had to be reasonable for the police to infer that there was a fair probability that evidence would be found in the safe. *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010). Even then, if in hindsight it is determined they erred, the error is to be forgiven if, under the circumstances presented at the time and the limitations in the warrant, opening the safe nonetheless was reasonable. *Id*. at 947. Finally, the scope of a search generally includes any area in which the items to be seized could be located, even if this requires separate acts of opening, including breaking into a locked container. *United States v. Pritchard,* 745 F.2nd 1112, 1115 & 1122 (7th Cir. 1984) (execution of search warrant for small electronic devices justified entry into containers in which they would fit and might reasonably be found, including forcing open a locked suitcase).

The search of the locked safe easily passes this constitutional muster. Maholmes has challenged the adequacy of the warrant and the breadth of the search through the overlapping lenses of hindsight and second-guessing. But back in October 2010, the situation was muddled and time seemed to be of the essence. Low had gone missing and the evidence surrounding her disappearance pointed in many directions, some of them diametric. Had she had been murdered and her body dragged away? Beaten bloody and kidnaped? Did Artez Williams have something to do with her disappearance? Or had it been "Trent" LNU? Was Low was safe but *incommunicado*, hiding where Maholmes, Williams and their coterie could not hound her? Had Low taken off on a spontaneous road trip with Trent? Or was she having mental health issues that had led to self-harm and rash flight? As is obviously inferred from the italicized language of the warrant (*supra* at 4) the police were just as interested in discovering evidence that would

6

rule out foul play as would support the suspicion of battery, kidnaping or murder. In other words, evidence that Low was safe and sound was probative and relevant to this investigation.

The most logical place to search for physical evidence that might answer these questions was Low's apartment. A small safe on the premises was not only a logical place to search for relevant evidence, it had the potential to be a goldmine: the safe might contain a diary written by Low. It might contain documents such as business or credit card receipts suggesting what Low had been doing or where she was headed, alone or with others. It might be empty but for smears from bloody fingers removing the safe's contents. Dozens of realistic–*i.e.*, reasonable– scenarios can be hypothesized as to what might have been in the safe that could have answered the "who, what, where, how and why" of Low's location and condition.

Maholmes has the luxury of labeling the warrant and the search "attenuated" and "far-fetched" because now we know that the safe did not hold any such evidence.[3] But going into the apartment, the police did not know what they would find or where they would find it. Even so, this was not a boundless search untethered to the circumstances presented: the police pulled back from the no-limits search used in drug investigations and looked only where they had an articulable reason to believe that they would find evidence relevant to their missing person investigation. In other words, both the warrant and the resulting search comported with the Fourth Amendment. There is no basis to grant Maholmes's motion to suppress evidence.

This ends the direct analysis, but the government presents a fallback "good faith" argument. The government is correct: even if the warrant had been too broad or the search too

---

[3] What the police *did* find provides the motive for Maholmes to be so critical of their investigation, which the court interprets as a tactical position rather than a lack of concern for Low, who apparently has yet to be found.

deep, the officers acted in good faith at all times and should not be subjected to suppression of evidence. They consulted with the district attorney, then applied for and obtained a warrant before searching Low's apartment. There is no evidence that the police misled the issuing judge, that the judge rubber-stamped a too-weak, too-broad warrant request, or that the application was so flimsy that it was entirely unreasonable for the police to rely on the resulting warrant. *United States v. Pappas*, 592 F.3d 799, 802 (7th Cir. 2010).

Even if this court were to find that the police search exceeded the scope of the warrant actually issued, this would not provide a basis to suppress the evidence seized from the safe. Courts are to suppress evidence only when police conduct has been sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the judicial system. The exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct *Herring v. United States*, 555 U.S. 135, 126 S.Ct. 695, 702 (2009). In other words, exclusion of evidence is an extreme sanction that applies only where it would result in appreciable deterrence. *United States v. Elst*, 579 F.3d 740, 747 (7th Cir. 2009). Here, the locked safe appears to be squarely within the scope of the warrant issued. If it was not, then searching the safe was not so far beyond the limits to demonstrate that the police deliberately or recklessly flouted the constraints of the warrant. In this situation, exclusion of the evidence would be too harsh a response.

RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court DENY defendant Eric Maholmes's motion to suppress evidence.

Entered this 21st day of June, 2011.

> BY THE COURT:
>
> /s/
>
> STEPHEN L. CROCKER
> Magistrate Judge